IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JASMINE MARIE WILLIAMS, | ) | CASE NO. 5:19-cv-00427 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Jasmine Marie Williams ("Plaintiff" or "Williams") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons explained herein, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

# I.  Procedural History

Williams protectively filed[1] an application for SSI on May 17, 2016, alleging a disability onset date of August 13, 2015.[2]  Tr. 15, 82-83, 97, 196-204, 208-213, 226.  She alleged disability due to hip dysplasia, anxiety, depression, and a learning disability.  Tr. 82, 116, 123, 229.  After initial denial by the state agency (Tr. 116-122) and denial upon reconsideration (Tr. 123-127), Williams requested a hearing (Tr. 131-133).  A hearing was held before the Administrative Law Judge ("ALJ") on May 3, 2018.  Tr. 31-63.

In her June 21, 2018, decision (Tr. 12-30), the ALJ determined that Williams had not been under a disability since May 17, 2016, the date the application was filed (Tr. 16, 26).[3] Williams requested review of the ALJ's decision by the Appeals Council.  Tr. 192-193, 292-296. On January 23, 2019, the Appeals Council denied Williams's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-6.

## II. Evidence

### A.    Personal, educational, and vocational evidence

Williams was born in 1993.  Tr. 25, 38, 208.  At the time of the hearing, Williams was living in an apartment with her sister and niece.  Tr. 38-39.  Williams graduated from high

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 10/28/2019).

[2] Williams filed a prior SSI application on May 20, 2013, alleging disability starting on April 26, 2004.  Tr. 67.  That application was denied on August 12, 2015.  Tr. 33, 64-81.

[3] In her decision, the ALJ discussed the prior August 12, 2015, decision and explained why she was or was not bound by findings made in that prior decision.  Tr. 15.  Williams does not challenge the ALJ's determination regarding the prior decision.

school. Tr. 41. Williams was in special classes since the first grade because of learning disabilities. Tr. 41. Williams had no past relevant work. Tr. 42.

**B.    Medical evidence**[4]

### 1. Treatment history

Williams received treatment for her hip pain through various providers at Summa Health System. On March 25, 2015, Williams saw Elizabeth Archinal, M.D., with complaints of left-sided hip pain that she had been having for a few months. Tr. 487-488. She reported having pain every day. Tr. 487. Williams's pain was worse with walking, especially for long periods or with stairs. Tr. 487. Williams denied numbness or tingling but indicated that sometimes she felt like her leg was going to give out. Tr. 487. Dr. Archinal assessed joint pain. Tr. 487. She also assessed somatic dysfunction in the pelvic/hip region, sacral region, lower extremity, and lumbar region. Tr. 487. Dr. Archinal applied OMT[5] for Williams's somatic dysfunction and prescribed ibuprofen for her joint pain. Tr. 488.

Williams saw Dr. Archinal on April 13, 2015, for follow up regarding her left hip pain. Tr. 485-486. Williams reported some ankle numbness and swelling and indicated her whole leg was numb for about two hours. Tr. 485. A heating pad helped with the swelling. Tr. 485. Ibuprofen was helping with her pain and the OMT had helped but only for the day that it was applied. Tr. 485. On examination, Williams exhibited exaggerated lumbar lordosis; she had normal range of motion in her extremities but she was unable to raise her leg above 45 degrees due to hamstring tightness; and her pulses in her extremities were 2+ bilaterally. Tr. 485. Dr.

---

[4] Williams's argument in this appeal pertains generally to her physical impairments. Accordingly, the medical evidence summarized herein is generally focused on evidence relating to Williams's physical impairments.

[5] "OMT" likely refers to osteopathic manipulative treatment which "is a set of hands-on techniques used . . . to diagnose, treat, and prevent illness or injury." *See* https://osteopathic.org/what-is-osteopathic-medicine/osteopathic-manipulative-treatment/ (last visited 10/28/2019).

Archinal noted uncertain etiology of pain.  Tr. 486.  She felt Williams could benefit from more regular OMT but Williams declined.  Tr. 486.  Dr. Archinal advised Williams to start taking acetaminophen for pain; ordered x-rays of Williams's hip and spine; and referred Williams for physical therapy, noting that there should be an emphasis on stretching and strengthening.  Tr. 485-486.

  During a June 2, 2015, visit with Dr. Archinal, Williams complained of continued pain in her left hip that was radiating into her lower back.  Tr. 483-484.  Williams was not working.  Tr. 483.  She reported spending the day riding around on buses, shopping, etc. and watching her 5-year-old cousin but she did not lift him.  Tr. 483.  Williams was doing some exercises that she had been shown.  Tr. 483.  OMT was helpful but only temporarily.  Tr. 483.  Williams had not gone to physical therapy.  Tr. 483.  She indicated that the referral had not been received when she called.  Tr. 483.  Williams was taking acetaminophen and ibuprofen.  Tr. 483.  Dr. Archinal assessed "spasm of muscle" and started Williams on cyclobenzaprine.  Tr. 483.  Dr. Archinal noted that Williams's hips and back were markedly tight and Williams was very anxious.  Tr. 484.  Williams had been seeing psychiatry and attending counseling.  Tr. 483.  Dr. Archinal encouraged Williams to schedule physical therapy and OMT and to continue taking acetaminophen and ibuprofen, performing home stretches and applying heat.  Tr. 484.

On June 25, 2015, Williams saw Katherine Carmichael, D.O., for OMT.  Tr. 477-480. Williams reported that her left hip and low back pain was relieved with warm showers, ibuprofen, Tylenol, Flexeril and worsened by walking too much.  Tr. 477.  Williams had been attending physical therapy and relayed that she thought it was helping.  Tr. 477.  Williams was also doing home exercises.  Tr. 477.  Dr. Carmichael noted that x-rays taken of Williams's left hip and lumbar spine in April 2015 were normal.  Tr. 477.  Williams reported some numbness

4

but no weakness.  Tr. 477.  Overall, Williams indicated her pain had stayed about the same.  Tr. 477.  On physical examination, Dr. Carmichael observed decreased range of motion in Williams's hips and lumbar back.  Tr. 478.  There was also tenderness in Williams's lumbar back.  Tr. 478.  Williams's straight leg raise was negative but she had hamstring tightness bilaterally.  Tr. 478.  Williams had equal strength and sensation bilaterally.  Tr. 478.  Dr. Carmichael indicated that she felt that Williams's musculoskeletal pain was likely muscular spasm versus possible trochanteric bursitis versus superficial pinched nerve versus other underlying inflammatory or rheumatologic condition.  Tr. 478-479.  Dr. Carmichael recommended that Williams continue with physical therapy, OMT, home exercises, and ibuprofen and Tylenol as needed for pain.  Tr. 479.  If Williams's pain failed to improve, Dr. Carmichael indicated that Williams could consider a trochanteric injection.  Tr. 479.  Williams noted she has had "shaking" all her life when she tries to relax.  Tr. 479.  Dr. Carmichael observed mild shaking during OMT and she recommended that Williams seek further evaluation regarding the issue.  Tr. 479.

Williams saw Dr. Archinal on July 8, 2015. Tr. 473-476.  Williams relayed that her hip pain seemed to be slowly improving with exercises but was taking longer than expected.  Tr. 473.  Williams's tremors were worse with exercise and her knee/leg would shake at times when at rest.  Tr. 473.  Dr. Archinal noted that Williams's physical therapist had communicated with her regarding Williams's progress.  Tr. 473.  Williams was participating well in physical therapy and performing home exercises for about a month but she had made little progress.  Tr. 473.  Williams was fatiguing easily with exercise; she had tightness in her hip flexors and hamstrings; she had difficulty maintaining an upright posture during exercise; and at times she had labored speech and would lose her train of thought.  Tr. 473.  Williams's physical therapist was

questioning an uninvestigated etiology, e.g., a neurological problem.  Tr. 473.  On physical examination, Williams exhibited no edema or tenderness; her reflexes were normal; her muscle tone was normal; and her coordination was normal.  Tr. 474.  Williams's speech was quiet and hesitant but not slurred or delayed – she gave an overall impression of withdrawn anxiety.  Tr. 475.  Dr. Archinal's assessment included left hip pain and depression.  Tr. 475.  Dr. Archinal indicated that Williams's hip pain was likely related to chronic muscle tension, noting that Williams also had tremors and intermittent syncope but Dr. Archinal did not think things pointed to any particular neurological or rheumatological disorder.  Tr. 475.  Dr. Archinal indicated that, [i]n the absence of any concerning physical exam findings, we will continue with home exercises and OMT, and attempt to improve mental health status."  Tr. 475.

Williams saw Kyle Yoder, D.O., on July 15, 2015.  Tr. 469-471.  Physical examination showed normal range of motion and strength in the hips bilaterally and normal range of motion and no tenderness in the lumbar back.  Tr. 469-470.  OMT examination findings were: overall poor posture; decreased pelvic rotation to the right; anterior right innominate; inflare right innominate; left lumbar paraspinal muscle hypertonicity; and decreased range of motion with right leg abduction.  Tr. 470.  Neurologically, Williams was alert; she had normal sensation and strength; and her gait was normal.  Tr. 470.  Dr. Yoder assessed left hip pain, somatic dysfunction of lower extremity, somatic dysfunction of pelvic region, and somatic dysfunction of lumbar region.  Tr. 470.  Dr. Yoder recommended that Williams follow up with her primary care physician and continue OMT as long as it was providing relief.  Tr. 470.

On August 3, 2015, Williams sought treatment at the emergency room for acute on chronic left hip pain.  Tr. 336-347.  Williams denied any new trauma since she started having her hip pain about seven months prior but relayed that her pain had become progressively worse

6

since the day before.  Tr. 336.  Williams was requesting "readjust[ment] [of] her hip[.]"  Tr. 336.

Williams denied any paresthesia, weakness or loss of function of her left lower extremity and

stated that her pain was localized to the left lateral aspect of her hip with no associated radiation.

Tr. 336.  On physical examination, no spinal tenderness was observed in the back.  Tr. 336.

There was mild tenderness to palpation of the lateral aspect of the left lower extremity with no

associated deformity, abrasion or contusion and strength was 5/5.  Tr. 336.  Williams received a

shot of Toradol.  Tr. 337.  Since no new trauma was reported and the last x-rays were within

normal limits no new imaging was ordered.  Tr. 337.  The attending physician recommended that

Williams follow up with her primary care physician and physical therapist.  Tr. 337.

On August 12, 2015, Williams saw Brittany Jergovich, D.O., for OMT.  Tr. 464-465.

Williams relayed that she had pain in her left hip, low back, and along the outside of her left

upper leg.  Tr. 464.  Williams's pain was worse with walking, climbing stairs, and walking on

uneven ground.  Tr. 464.  A heating pad and Tylenol and ibuprofen helped with the pain.  Tr.

464.  During physical therapy, Williams had been told that one leg was shorter than the other –

she had an insert for her shoe but indicated that it made the pain worse.  Tr. 464.  Dr. Jergovich

observed that the lumbosacral spine area revealed no local tenderness or mass; there was full and

painless lumbosacral range of motion; straight leg raise was negative at 90 degrees on both sides;

reflexes, motor strength, and sensation were normal, including heel and toe gait; peripheral

pulses were palpable; and hip and knees had full range of motion without pain.  Tr. 465.  Dr.

Jergovich's structural exam showed increased tension of the quadratus lumborum on the left in

the lumbar area; "left upslip" of the hip; and increased tension of the iliotibial band and biceps

femoris restriction of the left lower extremity.  Tr. 465.  Dr. Jergovich assessed iliotibial band

syndrome and she showed Williams stretches that should be done at home twice each day.  Tr.

7

465.  Dr. Jergovich also advised Williams to ice the area twice each day.  Tr. 465.  Following her

OMT treatment, Williams noted improved range of motion.  Tr. 465.

Williams saw Janice Camino, M.D., on September 10, 2015, for complaints of lower

back pain and left hip pain.  Tr. 450-452.  Williams indicated that her low back symptoms were

improving especially with Flexeril and ibuprofen.  Tr. 450.  Williams had completed physical

therapy but indicated she was discharged because she was unable to handle the pain associated

with therapy.  Tr. 450.  She was continuing to perform exercises as shown to her.  Tr. 450-451.

Williams's hip pain was stable at that time.  Tr. 451.  Williams noted that she usually lifts her

nephews and nieces who weigh more than 20 pounds without bending her knees.  Tr. 451.  She

indicated that her hip and knee pain was worse after lifting them.  Tr. 451.  Dr. Camino's

musculoskeletal examination revealed tenderness to palpation in the bilateral paralumbar region

and left hip joint; there was no edema on the joints; there was some decreased range of motion;

scoliosis was absent; and there was mild lordosis.  Tr. 451.  The neurological examination

revealed a negative straight leg raise; slight eversion in gait; heel walk and toe walk were

normal; motor function was normal; sensory function was normal; and reflexes were intact and

symmetrical bilaterally.  Tr. 451.  Dr. Camino indicated that the clinical picture was most

consistent with a diagnosis of lumbosacral strain.  Tr. 451.  Dr. Camino discussed proper

lifting/bending techniques and stretching exercises.  Tr. 451.  Dr. Camino recommended water

therapy since regular therapy did not work due to pain.  Tr. 451-452.

Williams saw Dr. Camino on December 10, 2015, regarding her left lower back and left

hip pain.  Tr. 432-434.  She described her pain as aching, burning, and tingling in nature with

radiation into her leg.  Tr. 432.  Williams's pain was "constant, typically moderate in intensity,

and [was] exacerbated by flexion, extension, sitting, standing, lying down, climbing stairs and

inactivity."  Tr. 432.  Associated symptoms included paresthesias and numbness of her left leg.
Tr. 432.  Dr. Camino's musculoskeletal examination revealed normal range of motion; Williams
was tender to palpation on the left ASIS; she had 5/5 strength in the lower extremities; negative
straight leg test; there was no groin pain; and no crepitus in the hip.  Tr. 433.  Dr. Camino
observed that one leg was noticeably shorter.  Tr. 433.  Dr. Camino assessed pain of both hip
joints and indicated that Williams's pain was likely musculoskeletal with the cause likely due to
asymmetry between her legs that caused Williams to bear more weight on her right leg.  Tr. 434.
Dr. Camino recommended re-evaluation after Williams did home exercises for hip pain and
possibly shoe inserts or other mechanical compensation for the congenital deficit of the left leg.
Tr. 434.

A month later, on January 6, 2016, Williams saw Stanley Hunter, M.D., in sports
medicine regarding her left hip pain.  Tr. 425-430.  Williams reported that the pain started a year
earlier.  Tr. 426.  Her pain radiated down her leg at times and was sharp in nature.  Tr. 426.
Williams's pain was reportedly better with hot compresses.  Tr. 426.  She denied weakness or
numbness.  Tr. 426.  Her pain was worse with walking and started within one minute of walking.
Tr. 426.  She indicated that her hip "locks up."  Tr. 426.  Williams was no longer in physical
therapy.  Tr. 426.  She had done physical therapy in the past with partial improvement.  Tr. 426.
Dr. Hunter reviewed the April 2015 x-rays and performed a physical examination.  Tr. 426.  He
assessed arthralgia of the left hip, noting a highly antalgic gait.  Tr. 429.  He indicated that
Williams's neurological examination overall was reassuring.  Tr. 429.  Dr. Hunter suspected that
a substantial part of Williams's pain was from postural factors affecting her muscles.  Tr. 429.
While he did not observe it on examination, "hip locking [and] catching suggest[ed] mechanical
etiology in hip joint."  Tr. 429.  Also, Dr. Hunter indicated that "[r]eproduction of pain with

9

isolated femoral internal [and] external rotation suggest[ed] intraarticular source[]." Tr. 429.  Dr. Hunter recommended physical therapy and repeat x-rays.  Tr. 429.  Dr. Hunter also discussed possible injections, NSAIDs, and postural realignment.  Tr. 429.

Williams saw Dr. Hunter and Nilesh Shah, M.D., on January 14, 2016.  Tr. 367-371.  Dr. Hunter reviewed hip x-rays taken on January 14, 2016.  Tr. 370.  The x-rays showed no fracture or dislocation; no significant degenerative changes or arthropathy; there was mild bilateral flattening of the femoral heads; there was notable asymmetry of the pelvis; and the left hip was about 1.9 cm higher than the right.  Tr. 370.  Dr. Hunter felt that Williams's left hip joint was likely causing her pain because the most pronounced exam maneuver was left hip range of motion, particularly internal/external rotation.  Tr. 371.  Dr. Hunter recommended a left hip injection.  Tr. 371.

On February 3, 2016, Dr. Shah administered an injection in Williams's left hip.  Tr. 362-365.  Following the injection, Williams reported much improvement in her pain but still felt like something was catching in her hip.  Tr. 365.  Dr. Shah indicated that, if Williams's pain did not improve within two weeks, an MRI might be warranted to look for cause of mechanical symptoms.  Tr. 365.  Williams returned to see Dr. Shah on February 18, 2019.  Tr. 358-361.  She reported minimal benefit from the injection.  Tr. 358.  She had also tried physical therapy and NSAIDs without benefit.  Tr. 358.  Williams was continuing to have pain with ambulation and catching of her left hip joint.  Tr. 358.  On physical examination, Dr. Shah observed an antalgic gait.  Tr. 360.  Dr. Shah recommended an MRI.  Tr. 361.

Williams saw Dr. Shah on March 14, 2016, for follow up regarding the MRI results.  Tr. 352-356.  The impression from the left hip MRI, taken on March 8, 2016, was "[m]ildly shallow dysplastic left acetabulum along with internal rotation or anteversion of the left femoral neck[;]"

10

"[i]ntermediate grade partial-thickness tear along the ligamentum teres origin with some morphologic irregularity[,] . . . rais[ing] concern for possible ligamentum impingement along the acetabulum[;]" "[t]race signal irregularity seen along the anterior labrum peripherally thought to likely represent artifact [and] [a] tiny tear in this region is not entirely excluded but felt a less likely consideration[;]" and "mild tendinopathy gluteus medius." Tr. 355-356. Dr. Shah's assessment was left hip impingement syndrome and hip pain, chronic, left. Tr. 356. Dr. Shah recommended that Williams see Javon Laskovski, M.D., at the Crystal Clinic, Inc., for an opinion regarding surgical intervention. Tr. 356.

On March 29, 2016, Williams saw Dr. Laskovski for an evaluation of her left hip pain. Tr. 511-513. Dr. Laskovski concluded that Williams had a labral tear, ligamentum tear with possible impingement and a patulous hip capsule. Tr. 513. Dr. Laskovski discussed options with Williams and Williams indicated she would like to try therapy again prior to discussing surgery. Tr. 513.

Williams's first physical therapy session at the Crystal Clinic occurred on April 13, 2015. Tr. 507-508. During that visit, Williams relayed that her injury was a year old. Tr. 508. Williams relayed that she had injured herself jumping off a step at her house and her primary concern was her left hip pain and weakness. Tr. 508. She relayed that she had decreased range of motion and strength; difficulty with ambulation; and increased pain with functional activities. Tr. 508. The physical therapist observed that Williams ambulated with an antalgic limp and chose not to use an assistive device. Tr. 508. Williams favored her right lower extremity. Tr. 508. The therapist concluded that Williams's symptoms were consistent with her diagnosis and he recommended therapy to reduce her impairments and functional limitations from her condition. Tr. 507.

On April 27, 2016, Williams saw Dr. Laskovski for follow up regarding her left hip pain. Tr. 503-506.  Williams relayed that her pain was worse since her last visit.  Tr. 506.  She described her pain as sharp, aching, dull and throbbing.  Tr. 506.  Williams reported that she had been doing a lot of walking.  Tr. 506.  She had not fallen within the prior six months.  Tr. 506. Williams had been treating with physical therapy but she was getting worse with physical therapy.  Tr. 504, 506.  She was having more trouble walking and trying to perform her activities of daily living.  Tr. 504.  After discussing all options, Williams indicated she wanted to proceed with surgery.  Tr. 504.

On June 21, 2016, after attending five physical therapy sessions, Williams was discharged from physical therapy because she had not attended physical therapy since April 26, 2016.  Tr. 569.

During a May 20, 2016, appointment with her psychiatrist Therese Scavelli, M.D., at Coleman Professional Services,[6] Williams relayed that she was scheduled for hip surgery in June 2016.  Tr. 514.  Williams indicated she would need help from her family following her surgery but was concerned that her family would not be there to help her.  Tr. 514.  Nurse practitioner Laura Hare indicated in a statement completed on July 19, 2016, that Williams was scheduled for total hip replacement surgery.[7]  Tr. 586.

Williams left Ohio in June 2016 and moved to Mississippi where she stayed with various family members.  Tr. 657.  She returned to Ohio in November 2017.  Tr. 657.  While Williams was in Mississippi, on January 31, 2017, she saw Allen Butler, M.D., at the Mississippi Bone

---

[6] Williams received mental health services through Coleman Professional Services during 2016 through 2018.  Tr. 514-537, 538-557, 640-690.  The bulk of these treatment records are not detailed herein because Williams's appeal pertains generally to her physical impairments.

[7] Williams states in her brief that Ms. Hare was her counselor.  Doc. 12, p. 4.

and Joint Clinic for her left hip pain. Tr. 614-615. Williams reported constant, burning pain and relayed that her hip locked up. Tr. 614. Williams relayed that she had seen ortho in Ohio and was scheduled for surgery but she did not show for her surgery. Tr. 614. Dr. Butler recommended surgery and Williams indicated she wanted to proceed. Tr. 615. However, after her appointment, Williams returned and relayed that she wanted to think about surgery. Tr. 615. She was advised to call Dr. Butler's office if she wanted to proceed. Tr. 615.

After returning to Ohio, on December 26, 2017, Williams returned to see Dr. Laskovski after last seeing him on April 27, 2016. Tr. 629-632. Williams indicated that her hip was worse than when she last saw Dr. Laskovski and she wanted to discuss surgery. Tr. 629. Dr. Laskovsko observed an antalgic gait on the left. Tr. 630. Dr. Laskovski ordered an MRI for further evaluation of the hip. Tr. 632.

Williams saw Dr. Laskovski on January 16, 2018 to discuss the test results, which were completed on January 11, 2018. Tr. 620-623. Dr. Laskovski indicated that Williams had a large ligamentum teres tera, labral tear, dysplasia with CE of 17 and a cam lesion. Tr. 622. Williams was in constant pain daily and barely able to ambulate. Tr. 622. She was interested in proceeding with a hip scope procedure. Tr. 622. Dr. Laskoski performed the hip surgery – left hip scope with legamentum teres debridement, fovea-plasty, foveal debridement, synovectomy, femoroplasty, and capsular plication – on March 12, 2018. Tr. 635-638. There were no complications with the surgery. Tr. 636. No post-operative records were submitted. Tr. 21.

### 2. Opinion evidence

#### *Treating providers*

On March 6, 2018, Dr. Laskovski completed a statement regarding Williams's ability to perform work-related activities. Tr. 588-589. Dr. Laskovski opined that Williams's

lifting/carrying were affected by her impairment.  Tr. 588.  Dr. Laskovski opined that Williams could not lift/carry any weight due to a left hip labral tear and she would be "off work completely until released by surgeon."  Tr. 588.  Dr. Laskovski also indicated that Williams would be unable to stand/walk at all, again noting "off work completely until released by surgeon."  Tr. 588.  Dr. Laskovski opined that Williams's sitting would not be affected by her impairment.  Tr. 588.  Dr. Laskovski opined that Williams would be unable to perform any postural activities due to left hip surgery.  Tr. 588.  Dr. Laskovski indicated he would expect Williams to miss work more than four days per month and be off task throughout an 8-hour workday over 20% of the time due to pain or fatigue.  Tr. 588-589.  Dr. Laskovski opined that he expected that Williams would need to lie down two hours or more during the course of an 8-hour workday if she was working a sedentary job.  Tr. 589.  Dr. Laskovski opined that Williams would be able to use her hands less than 10% of the time during the course of an 8-hour workday and she would need to take unscheduled breaks more than four times per day.  Tr. 589.  When asked to provide the medical findings that supported his opinion, Dr. Laskovski stated "surgery on left hip is scheduled for 3/12/18 off work for up to 3 months after surgery est. date 6/10/18 to return[.]"  Tr. 589.

On July 19, 2016, nurse practitioner Laura Hare completed two forms.  Tr. 583-587.  One form pertained to Williams's mental health limitations (Tr. 583-585) and the other pertained to Williams's physical limitations (Tr. 586-587).  In the form pertaining to Williams's mental abilities, Ms. Hare indicated that Williams was significantly limited in almost all areas.  Tr. 583-584.  Ms. Hare indicated that Williams was "unable to work," "would have difficulty working," and was "unable to work due to hip problems and needs help."  Tr. 584-585.  In the form relating to Williams's physical limitations, Ms. Hare stated that Williams had limitations in

14

lifting/carrying, standing/walking, and sitting; she could perform no postural activities; and she could not be around moving machinery.  Tr. 586.  Ms. Hare referred to Williams's chronic left hip pain and left hip dysplasia as support for her assessments.  Tr. 586-587.  Ms. Hare added that Williams "should be able to work <u>with no restrictions</u> after [left] hip is replaced.  At this time, she <u>cannot</u> work.  She limps severely and cannot walk/sit without severe pain."  Tr. 586 (emphasis in original).

> ### *State agency reviewers*

On August 14, 2016, state agency reviewing physician Leanne M. Bertani, M.D., completed a Physical RFC Assessment.  Tr. 92-94.  Dr. Bertani opined that Williams could occasionally lift and/or carry 10 pounds and frequently lift and/or carry 10 pounds; stand and/or walk a total of 2 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; limited to occasional use of foot control pedals with left lower extremity, noting Williams had an antalgic gait and extremely dysplastic hip; never climb ladders/ropes/scaffolds, noting Williams's hip dysplasia; occasionally climb ramps/stairs and crawl; and frequently balance, stoop, kneel, and crouch; and must avoid concentrated exposure to unprotected heights due to antalgic gait.  Tr. 92-93.

Upon reconsideration, on September 26, 2016, state agency reviewing physician Venkatachala Sreenivas, M.D., completed a Physical RFC Assessment reaching similar opinions as Dr. Bertani, except Dr. Sreenivas's opinion was more limiting in some respects.  Tr. 107-109.  Dr. Sreenivas limited Williams to occasional balancing and kneeling rather than frequent and found that Williams had to avoid all exposure to unprotected heights and heavy machinery.  Tr. 107-109.

### C.    Hearing testimony

#### 1.  Plaintiff's testimony

Williams was represented at and testified at the hearing.  Tr. 37-55.  Williams does not have a driver's license because she was unable to pass the test.  Tr. 39.  If necessary, Williams takes the bus to get to places.  Tr. 39.  She usually does not ride the bus by herself.  Tr. 39-40.  Prior to her hip surgery, Williams had ridden the bus by herself a few times but one time she blacked out from being in so much pain.  Tr. 40.  The bus driver relayed to her that he pulled the bus over and helped Williams into her seat.  Tr. 40.  Williams usually stays home in bed because she is hurting and typically only leaves the house for medical appointments.  Tr. 39-40.  Williams was in pain during the hearing, which the ALJ noted.  Tr. 40, 45.  She takes her pain medication in the evening so she can try to get some sleep.  Tr. 40.

Williams indicated she did not think she could work a full-time job because she is unable to move around the way she used to.  Tr. 43.  For example, she is unable to squat down and do things that she used to be able to do.  Tr. 43.  Williams had surgery on her hip in March 2018, shortly before the hearing.  Tr. 43-44.  Williams was using a walker at the hearing and had been using it since her hip surgery.  Tr. 43.  Williams had been attending physical therapy since her surgery and had been trying to heal.  Tr. 44.  Williams had arthroscopic hip surgery – she did not have a hip replacement.  Tr. 44.  Williams indicated that her doctor mentioned that she would probably need to have another surgery.  Tr. 44.  The doctor had not yet scheduled another surgery – he was waiting to see Williams for her 12-week check-up.  Tr. 44.

Williams relayed that she put off having surgery, thinking that she would be able to try and do more on her own without surgery but she indicated she only made it worse.  Tr. 46, 47.

16

Williams had some problems getting up in time to make it to the restroom. Tr. 46. Williams's sister had been helping her. Tr. 46-47. Her sister had been helping her get in and out of the tub and get dressed. Tr. 46-47. Williams needed help getting dressed since 2017. Tr. 47. Williams can dress her upper body and wash some parts of her body but she is unable to bend and wash her left side. Tr. 49. Leading up to her surgery and over the prior couple years, Williams's hip pain made it difficult for her to sit. Tr. 54. She would have a sharp, needle-like sensation. Tr. 54. Williams would have to adjust herself during the course of the day so she could try to get more comfortable. Tr. 54-55.

Williams had moved to Mississippi at one point to be with her mother while her mother had surgery. Tr. 52. Williams felt it would give her time to think about her own surgery. Tr. 52. Williams felt that, since her mother could get through her surgery, she would be able to get through her own surgery. Tr. 52.

As far as hobbies, Williams plays word games on her phone, she stays in touch with her family through Facebook, and she watches television. Tr. 52-53. Except for Williams's sister and niece, her family and friends live in Mississippi. Tr. 53. Williams moved to Ohio so she could live with her sister because Williams's mother did not have a place for Williams to stay with her. Tr. 53-54.

### 2. Vocational expert's testimony

Vocational expert ("VE") Alena Kurtanik testified at the hearing. Tr. 55-62. The ALJ indicated to the VE that he found that Williams had no past relevant work. Tr. 57. The ALJ proceeded to ask the VE a series of hypothetical questions. Tr. 57-62. In response to a hypothetical question containing the limitations set forth in the RFC assessment, which limited the individual to sedentary exertional work along with other limitations, the VE identified the

following jobs as being available: document preparer; small parts assembler; and ticket checker. Tr. 57-58.  The VE indicated that, if the described individual also required a cane for ambulation, her testimony would not change provided that the individual was able to carry 10 pounds.  Tr. 59.  However, if the individual required a wheeled walker, there would be no sedentary work available.  Tr. 59.  Also, the VE indicated that the individual would be unable to perform any sedentary work with a wheeled walker.  Tr. 59.

The VE indicated that an individual could be off task up to 15% of an 8-hour workday, in addition to regularly scheduled breaks, and still remain competitively employable and an individual could be absent on average a half a day up to one day per month and still remain competitively employable.  Tr. 59-60.  In response to questioning from Williams's attorney, the VE indicated that, if an individual could stand and walk for 4 hours out of a day but only sit for 4 hours out of a day and could only do so in 15-minute intervals, the individual could still perform sedentary work as long as she could stay on task – if the individual would have to stretch, take a break, move around, or have a cane for balance, she would not be able to perform the work.  Tr. 61-62.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable to
> do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national economy [8] . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920;  *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the

---

[8] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In her June 21, 2018, decision, the ALJ made the following findings:[9]

1.  Williams has not engaged in substantial gainful activity since May 17, 2016, the application date.  Tr. 17.

2.  Williams has the following severe impairments: left hip dysplasia with ligament damage, status-post arthroscopic debridement and repair (the "hip impairment"), pervasive developmental disorder, major depressive disorder, generalized anxiety disorder, and borderline intellectual function. Tr. 17-18.  Williams has the following non-severe impairments: back pain and attention deficit disorder.  Tr. 18.

3.  Williams does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.  Tr. 18-20.

4.  Williams has the RFC to perform sedentary work as defined in 20 C.F.R. 416.967(a) except that she may occasionally balance, stoop, kneel, crouch, crawl, climb ramps and stairs, but may never climb ladders, ropes, or scaffolds; she must avoid all exposure to workplace hazards, including moving mechanical parts and unprotected heights; she is limited to the performance of simple, routine tasks and the making of no more than simple, work-related decisions, undertaken in a work setting free of fast-paced production requirements as are found in assembly line work, which setting requires no more than frequent interaction with others, which setting imposes no more than routine workplace changes, explained in advance of integration into the jobs' process.  Tr. 20-25.

5.  Williams has no past relevant work.  Tr. 25.

6.  Williams was born in 1993 and was 22 years old, which is defined as a younger individual age 18-44, on the date the application was filed. Tr. 25.

7.  Williams has at least a high school education and is able to communicate in English.  Tr. 25.

8.  Transferability of job skills is not an issue because Williams does not have past relevant work.  Tr. 25.

---

[9] The ALJ's findings are summarized.

9.   Considering Williams's age, education, work experience and RFC, there are jobs that existed in the national economy that Williams can perform, including document preparer, assembler, and ticket checker.  Tr. 25-26.

Based on the foregoing, the ALJ determined that Williams had not been under a disability, as defined in the Social Security Act, since May 17, 2016, through the date the application was filed.  Tr. 26.

### V.      Law & Analysis

### A.      Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).   The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

### B.      The undersigned recommends that the Court AFFIRM the Commissioner's decision

Williams's sole argument is that the ALJ erred with respect to her treating physician Dr. Laskovski's March 2018 opinion.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the

other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for the weight he assigns to the opinion. *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544; *Cole v. Comm'r of Soc. Sec.*, 661 F.3d 931, 937 (6th Cir. 2011). In deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion. *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c).

An ALJ is not obliged to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions. *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011). The "procedural 'good reasons' rule serves both to ensure the adequacy of review and to permit the claimant to understand the disposition of [her] case." *Miller v. Berryhill*, 2018 WL 3043297, * 7 (E.D.Mich., May 29, 2018)(quoting *Friend v. Comm'r of Soc. Sec.*, 375 Fed.Appx. 543, 550-51 (6th Cir. 2010)), *report and recommendation adopted*, 2018 WL 3036340 (June 19, 2018).

The ALJ did not ignore Dr. Laskovski's opinion. The ALJ considered the opinion, stating:

> The claimant's orthopedic surgeon, Jovan Laskovski, M.D., indicated on March 6, 2018, that the claimant would have multiple limitations and be completely unable to work from March 12, 2018 to June 10, 2018, owing to hip surgery.  Dr. Laskovski treated the claimant and is reporting within the bounds of his professional certifications and specialty.  However, all limitations are explicitly intended to last less than twelve consecutive months.  By very definition, they are not limitations directed to a severe impairment.  In consequence, no analysis will be offered for this opinion.

Tr. 23-24.

Williams claims that the foregoing analysis is insufficient to satisfy the procedural protections afforded a claimant under the treating physician rule.  She contends that the ALJ mischaracterized Dr. Laskovski's opinion by limiting the opinions therein to the stated period and that the ALJ failed to analyze the time frame prior to Dr. Laskovski's opinion.  The undersigned disagrees.

Williams has not shown that the ALJ's characterization of the opinion is unsupported by the record.  Dr. Laskovski's opinion that Williams would be unable to work is limited to an estimated three-month post-surgical window.  Tr. 588-589.  Furthermore, as indicated in the ALJ's decision, no post-operative records were submitted to the record following the March 12, 2018, surgery.  Tr. 21.  Additionally, the ALJ did consider the time frame before Dr. Laskovski offered his opinion.  The ALJ considered Williams's hip impairment in light of the evidence of record, which included evidence that, while surgery was recommended as far back as 2016, Williams did not show for a surgery in 2016 and she also cancelled another surgery in 2017.  Tr. 21.  Further, Williams was discharged at one point from physical therapy in 2016 for non-attendance.  Tr. 21.  Also, the ALJ considered examination findings, medications taken to address her impairment, and Williams's activities of daily living.  Tr. 21, 23.  Thus, while Williams attempts to argue that Dr. Laskovski's opinion covers a much broader time period that

the ALJ should have considered, the ALJ did consider evidence relating to that earlier time period.  However, that evidence did not alter the ALJ's decision.

Williams also argues that Nurse Hare's opinions, which limited Williams to less than sedentary work in July 2016 due to chronic hip pain and left hip dysplasia and indicated that Williams needed surgery, demonstrate that Dr. Laskovski's opinion is supported for the entire time period.  The undersigned finds Williams's argument unpersuasive.  Although not an acceptable medical source, the ALJ considered and weighed Nurse Hare's 2016 opinions.  Tr. 24-25.  The ALJ assigned only minimal weight to Nurse Hare's opinions, in part, because the ALJ found that her opinions were not consistent with or supported by the overall evidence of record (Tr. 24-25) and Williams does not challenge the ALJ's weighing of Nurse Hare's opinions.

Although the ALJ stated no analysis would be offered for Dr. Laskovski's opinion, she made her reasons clear and Williams has not shown that those reasons are not supported by substantial evidence.  By indicating that no analysis would be offered, the ALJ implicitly assigned no weight to the opinion.  Considering the ALJ's discussion of the other evidence of record and explanation regarding Dr. Laskovski's opinion, it cannot be said that Williams was not provided information needed to understand the disposition of her case.  Nor is the Court unable to conduct a review of the decision.  Here, as the ALJ explained, there is no indication in Dr. Laskovski's opinion that the limitations had lasted for twelve months or were expected to.  Further, as noted by the ALJ, Williams opted not to proceed with surgery in 2016 and in 2017 (Tr. 21), thus demonstrating that her impairment was not as disabling as she alleged during the earlier period.  Also, the ALJ considered and weighed other opinion evidence, including the opinions of the state agency reviewing physicians.  Tr. 23.  In weighing those opinions, which

limited Williams to a sedentary RFC, the ALJ found they were largely consistent with and supported by the evidence (Tr. 23) and Williams has not challenged the weight assigned to those opinions.

Considering the foregoing, the undersigned recommends that the Court find that the ALJ did not err with respect to Dr. Laskovski's opinion.  The ALJ did not ignore the opinion and explained why no weight would be assigned to it.  Furthermore, the ALJ considered the entirety of the record, including the period prior to Dr. Laskovski's opinion.  Additionally, to the extent that it is found that the ALJ did not adhere strictly to the treating physician rule when assessing and weighing Dr. Laskovski's opinion, the undersigned recommends that the Court find that any error is de minimis and should not serve as a basis for reversal and remand.  *See e.g.*, *Nunez v. Atrue*, 2013 WL 1908059, * 5 (N.D. Ohio May 7, 2013) (discussing that a treating physician rule error may be found to be de minimis and not a basis for reversal where there is no indication in the opinion that the limitations had lasted or would last the required twelve months).

### VII. Recommendation

For the reasons discussed herein, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.


October 28, 2019                              */s/ Kathleen B. Burke*
_____
                                             Kathleen B. Burke
                                             United States Magistrate Judge



### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).